AFFIRMED.

ED DE GRISELLES, ADMINISTRATOR, APPELLEE, V. LOUIS GANS, APPELLANT.

FILED APRIL 27, 1928. No. 25576.

*Blackburn & King,* for appellant.

*Gray, Brumbaugh & McNeil, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON and HOWELL, JJ., LANDIS and REDICK, District Judges.

REDICK, District Judge.

Action by Ed DeGriselles, individually and as administrator of the estate of Frank DeGriselles, for damages for the loss of services and death of plaintiff's minor son. Frank DeGriselles, a boy about nine years of age, was injured by a truck belonging to defendant and driven by his servant, from which injuries he died some four months after the accident. The case was tried to a jury, and after the evidence for both parties was concluded the defendant moved the court to direct a verdict for the defendant. The motion was overruled and the jury returned a verdict for the plaintiff in the sum of $5,000. Defendant's motion for a new trial was overruled and judgment rendered upon the verdict. Defendant appeals and presents but one ground for the reversal of the judgment, namely, that the evidence is insufficient to establish negligence of defendant.

The grounds of negligence charged against defendant's servant are: "(1) In failing to keep said truck under con-

trol; (2) in failing to blow his horn or give other signal of his approach; (3) in failing to operate said truck in such manner that upon becoming aware of the presence of decedent he could stop said truck; knowing, as he did, the use made of said alley by pedestrians and vehicles; (4) in driving said truck at a rate of speed which under the traffic conditions existing in said alley and known to defendant's driver to so exist was unlawful and dangerous to decedent and other persons using the alley." The above statement of the grounds of negligence is quoted from appellee's brief. The question submitted demands a somewhat detailed examination of the evidence.

The place of the accident was in a public alley 16 feet wide, with brick buildings on either side, the one on the north being 97 feet in length and that on the south 100 feet. At the west end of the building on the south was a doorway 10 feet wide, used as an entrance to the basement and second floor by means of inclines, the building being used as a stable and garage. Immediately to the west of the building on the north was a vacant space measuring 68 feet on the alley, and used as a service yard, and from which wagons and trucks crossed the alley to enter the garage above mentioned. The two buildings were used by the Alamito Dairy Company, and teams and trucks to the number of 52 were accommodated by said garage. The alley was paved with cement and from the east to the west end was on an upgrade of 4.4 per cent. The accident occurred about 3:30 p. m., at which time the surface of the alley was dry. At the time of the accident there was standing in the alley on the south side close to the brick wall and about 50 feet east of the place of the accident a team and wagon which had delivered feed at the garage, which feed was elevated to the second floor by means of an outside hoist.

Defendant's servant, Henry Bartels, was acquainted with the local situation above described, having made deliveries at that point almost daily for four years. On the day in question, as he was about to enter the east end of

the alley, he had to stop his car and back it a short distance to permit another truck coming from the west to emerge onto the street. He choked his engine, and got out and cranked it and then started up the alley in low gear, driving slowly, as he says, at 5 or 6 miles an hour, going to the narrow space between the wagon and the wall of the north building, about 8 or 9 feet, through which he had to pass, and changed to second gear after having passed the wagon.

At this point the testimony for the plaintiff as to the happening of the accident begins and is substantially as follows:

Witness O'Brien testified that he was coming out of the doorway of the garage, having come down the inclined approach just inside the doorway, and had gotten two or three feet into the alley and stepped back because he saw the truck approaching about fifteen feet east of him; no horn was blown; saw the boy knocked down by the truck about three feet south of the north line of the alley and three and one-half to four feet west of the building on the north side of the alley; the right front wheel of the truck hit him and ran up on the left side of the boy just above the hip; the boy's body lay north and south under the truck with his feet a little to the east; the truck backed off the boy. The truck was running in high gear about fifteen miles an hour. On cross-examination he stated that he saw the boy approaching, and the truck approaching from the east and holloed to the truck driver both before and after he hit the boy; the boy was not running. "The boy was not rolling a tire when I saw him." "The driver brought the truck to a stop within three or four feet after he put on the brakes; he could have seen the boy coming from behind that corner for a distance of about five or six feet; the front end of the truck was about four or four and one-half feet west of the wall when it stopped." When the witness' deposition was taken prior to the trial, he stated that the truck was about six or seven feet from the boy when he first saw it,

and also about ten or eleven feet from the witness; that he had first called to the driver after he had just struck the boy; that he could not say whether the boy tried to stop and slid from under his feet. And in the same deposition, in response to the question, "And the time that it took for the boy to get out from behind the garage and under that truck, only about three feet away, was practically instantaneous?" the witness answered, "Yes."

Witness Boye was standing at the east end of the wagon when the boy was hit; he heard no horn blown; thinks he would have heard the horn but could not say positively; "would not say the horn was not blown, but think if it had been I would have heard it."

Witness Thompson testified that he was standing with Boye about 50 feet east of the accident when the truck passed going west through the alley, observed its speed and would estimate it at 12 to 15 miles an hour; was not paying particular attention to the truck; the truck after it backed off the boy was a foot or two beyond the building on the north side; did not remember of hearing a horn blown, was not paying particular attention, it might have blown; did not see the boy before the accident; attention first attracted to boy when saw truck stop—heard a noise or a cry; picked up the boy who was conscious but squirming and holding his hand over his hip on the left side.

This constitutes substantially all of the evidence for plaintiff material to our inquiry.

Defendant's evidence was as follows:

Henry Bartels, defendant's servant, testified that he sounded the horn twice about half-way (25 feet) between the wagon and the corner where the accident happened; that he had not shifted into high gear when the boy came out from behind the building; shifted from low to intermediate just as he had passed the wagon; he was traveling in intermediate gear at approximately five or six miles an hour. The boy was running and had a tire; "he tried to stop himself, and slipped on the cinders on the paving, and slid right in front of my wheel;" the

wheel did not knock him down; witness tried to stop, using both foot and emergency brakes, and stopped in approximately four or five feet; after it came to a stop the truck was standing about one foot west of the corner of the building and right wheel three feet from north wall; had no time to blow his horn again or turn his truck toward the south after seeing the boy, because he was reaching for his brakes; could not say how long it was from time he saw boy coming from behind corner until truck stopped; "It all happened so quick, I don't know how long it did take. It all happened at once."

Emil Bartels, brother of Henry, who happened to be riding with him, testified that the horn was sounded 20 or 25 feet from the corner; traveling in intermediate gear, and as they approached the corner this boy was rolling a tire and came around the corner; he wanted to stop and his feet slipped from under him on some cinders there and he slid under the right front wheel of the truck, and before we could stop, the wheel was on the boy; we were going about five or six miles an hour; his brother put his foot on the brake; grabbed the emergency brake, and the car traveled something like four or five feet before it struck the boy about one or two feet beyond the building. On cross-examination he stated he first saw the boy running out from behind the building just as they were coming to the corner; he had gotten about two or three feet into the alley before the accident; "I saw the tire first; it came ahead of the boy;" shifted to intermediate gear just as we got by the wagon; witness was 23 years old and his brother Henry 26.

Vernard Alexander, a boy of 15 years, working for the Alamito dairy, testified that he had been driving the horse which operated the hoist above mentioned and was just turning him into the chute leading to the basement of the barn on the south side of the alley, and turned around and looked where the truck was coming and saw this boy coming down the alley rolling a tire, "and he came to the alley and he tried to stop on some cinders that had been pushed

out by horses and milk wagons, and he slid on the cinders, and slid under the wheels, and the truck went about a third of the way up on his body and backed off again;" he marked where he was standing in the doorway of the barn, about three feet east of the west side; that he saw a man who might be O'Brien also standing in the doorway.

Harry Shively testified that he was shipping and receiving clerk for the Alamito dairy, working inside and downstairs; that he heard of the accident about two or three minutes after it happened. He did not see it, and when asked how he knew that the accident happened two or three minutes before they called him, answered: "Well, when I heard the horn sound it was almost instantaneous after I heard that that the word came to me to call the doctor." He could not say definitely what automobile had sounded the horn.

The defendant contends that the evidence as outlined above is not sufficient to support the verdict in favor of the plaintiff and that his motion for an instructed verdict should have been sustained. The rule is well established in this jurisdiction that, where reasonable minds would draw different conclusions as to the establishment of certain facts, or from the facts established by the evidence, the case is one for the jury, and, therefore, before we can sustain defendant's contention we must be convinced that all reasonable minds must conclude from the evidence that no actionable negligence of the defendant has been proved.

The first, third and fourth grounds of negligence may be considered together. Can it be said in reason that the driver of the truck did not have it under proper control when he brought it to a stop within three to five feet after the boy appeared around the corner of the building? We think not. There is no evidence in the record as to the distance within which an automoile truck traveling from 12 to 15 miles an hour can be stopped, but it is undisputed that in the present instance it was stopped in from 3 to 5 feet, and if anyone will take the trouble to measure that distance upon the ground and then consider the ordinary

weight of such trucks and the ordinary method of stopping them, he must conclude that the driver of the truck in the present instance had the same under reasonable control, whether he was driving at 12 or 15 miles an hour, or 5 to 7 as testified by defendant's witnesses; at 15 miles an hour a vehicle is traveling 1,320 feet a minute or 22 feet a second; to stop within 6 feet involved less than a third of a second of time during which the operator must apply his brakes upon the sudden appearance of danger. Plaintiff's witness O'Brien testified that the truck was stopped in 3 or 4 feet after the brakes were applied, and that defendant could see the boy for a space of 5 or 6 feet as he came around the corner. The car was stopped after it had passed over about a third of the body of the boy, just above the hip on the left side. The evidence does not disclose that the body of the boy was struck by the car at any other place, and three witnesses for the defendant testified that the boy came running out from behind the building and slipped on some cinders and slid foremost under the front wheel of the car. This evidence is fortified by the position of the boy's body as he lay on his back under the car, being practically at right angles to its course. While one witness testified that the car knocked the boy down, this must be considered merely as a mode of expression, because the physical facts just recited absolutely refute the witness. We are convinced that the manner of the happening of the accident was as described by defendant's witnesses, and is the only reasonable conclusion to be drawn from the evidence. Assuming the rate of speed to have been 12 or 15 miles an hour, it was in no violation of any ordinance on that subject and, in view of the short space in which the vehicle was stopped, the rate of speed was not dangerous, and no inference of actionable negligence may be properly drawn on account of such rate of speed, for the reason, as before stated, the driver had the truck under reasonable control.

In *Thrapp v. Meyers*, 114 Neb. 689, it was held: "A driver of an automobile should have his car under such

reasonable control as will enable him to avoid collision with other vehicles, assuming that the drivers thereof will exercise due care." If in the present case the person killed had been a grown man running out from behind the building into the alley, it would have been the duty of the lower court to direct a verdict for the defendant on the evidence before us as to speed for lack of evidence of negligence or upon the ground of contributory negligence. The plaintiff's decedent, on account of his tender age, is not chargeable with contributory negligence, but in determining the existence of negligence upon the part of the defendant, having no notice of the presence of children, the same rules apply in both cases; and while the boy is not chargeable with negligence, if his act, whether negligent or not, was the proximate cause of his death, there can be no recovery. The rule announced in *Thrapp v. Meyers, supra,* requires the driver to exercise only that degree of care which would be required when others are exercising ordinary care; he is not bound to anticipate that conduct of children, of whose presence he has no knowledge, will be different from that of an ordinarily prudent person. We are of the opinion that none of the three charges of negligence referred to is sustained by sufficient evidence.

This brings us to the second charge—failure to blow the horn. For plaintiff we have three witnesses who testified that they did not hear any horn blown; one of them, O'Brien, saying that the horn did not blow. His entire evidence on the point was as follows: "Q. Was there any horn blown up to the time that you had gotten out into the alley three feet? A. No. Q. Was there any horn blown after that time? A. No." No foundation was laid for his testimony on this point beyond the fact that he stepped into the alley and saw the car 15 (10 or 11) feet east of him, or, as elsewhere stated, 7 feet from where the boy was struck, which would place the car just opposite the witness as he stepped into the alley and retreated to let the car pass. He does not say he would have heard the horn if sounded, or that he was paying any attention to·

the sounding of a horn. He had been inside the barn, coming down the incline to the doorway, and if, as defendant's witnesses state, the horn was sounded 20 or 25 feet east of place of accident, the witness might not have heard it. Under these circumstances we think this evidence cannot be considered as a positive statement of the fact, but is merely negative. The attention of the other two witnesses was not attracted to the question until the accident had happened. On the other side, two witnesses, Henry Bartels and his brother, testified that the horn was blown twice about half-way between the wagon and the corner of the building; and a third witness, Harry Shively, testified that he heard a horn sound and almost instantaneously was called upon by some one of the persons present to get a doctor. It is needless to repeat the arguments upon the question of the comparative value of negative and positive testimony or to restate the reasons underlying the almost unanimous decisions of the courts that the testimony of one credible witness to a positive fact may outweigh any amount of merely negative testimony. A discussion as to the value of this class of evidence will be found in *Dodds v. Omaha & C. B. Street R. Co.*, 104 Neb. 692, and *Kepler v. Chicago, St. P., M. & O. R. Co.*, 111 Neb. 273, 281. Assuming that a failure to sound a horn in the instant case might be considered negligence, such failure is not proved, and the finding of the jury, if based upon that charge, is insufficient to support the verdict. Defendant cites a number of analogous cases which are instructive upon the questions discussed herein: *Sund v. Smisek & Hrdlicka*, 105 Neb. 602; *Lovett v. Scott*, 232 Mass. 541; *Sorsby v. Benninghoven*, 82 Or. 345; *Borland v. Lenz*, 196 Ia. 1148.

The case of *Gandy v. Estate of Bissell*, 81 Neb. 102, cited by plaintiff, is not controlling. The first syllabus is in the following language:

"Where the judge of a district court, who has had the advantage of seeing the witnesses and observing their demeanor while testifying, overrules a motion for a directed verdict, and there is sufficient competent evidence in the

record, standing alone, to sustain the verdict returned by the jury, this court will not disturb such a verdict and reverse a judgment rendered thereon, even though the evidence in opposition to the verdict is such, as shown by the record, that a peremptory instruction might have been sustained."

If this language may be construed as holding that a refusal of the trial court to sustain a motion of the plaintiff for a directed verdict is not reversible error where the evidence in opposition to the verdict is such that a ruling granting the motion would have been sustained, we are constrained to withhold our approval thereof. Of course, if there was evidence sufficient to sustain a verdict for either party, a directed verdict would be improper; but if the evidence in opposition to the verdict is such that it would not be error to sustain the motion, and the verdict goes against the moving party, we are unable to perceive why an order overruling it is not reversible error. If this were not the rule, and the trial court refused to direct a verdict for the plaintiff, and the jury rendered a verdict for the defendant, the appellate court would be powerless to reverse the judgment, even though all reasonable minds would agree that the plaintiff was entitled to recover. We are not prepared to adopt such a rule. The case cited, however, was reversed on two other grounds, and the ruling on the point in question has not the force it might have if it was upon a point necessary to the decision of the case. We hold in this case that the evidence, as shown by the record, is entirely insufficient to show that the defendant was in any way negligent, and that the verdict finds no support therein. It follows that the judgment of the district court must be reversed and cause remanded.

REVERSED.

HOWELL, J., dissents.